[No. F004833. Fifth Dist. Sept. 3, 1986.]

THE PEOPLE, Plaintiff and Respondent, v.
DAVID BRYAN KELLY, Defendant and Appellant.

**[Opinion certified for partial publication.*]**

*Pursuant to California Rules of Court, rule 976.1, this opinion is certified for publication with the exception of parts II and III.

**COUNSEL**

Charles J. Soria, under appointment by the Court of Appeal, for Defendant and Appellant.

John K. Van de Kamp, Attorney General, Eddie T. Keller and Gelacio L. Bayani, Deputy Attorneys General, for Plaintiff and Respondent.

**OPINION**

**BALLANTYNE, J.—**

### INTRODUCTION

Defendant, David Bryan Kelly, was convicted by a jury of 17 felony counts of various sex crimes involving 2 young boys.

Prior to trial defendant made a motion for the psychiatric examination of one of the victims, James R., which was denied.

The defendant made a motion for new trial based on several grounds, including juror misconduct. The motion was denied.

Defendant filed a timely notice of appeal and raises three issues on his appeal.

## DISCUSSION

### I.

### WAS DEFENDANT DENIED A FAIR TRIAL BECAUSE ONE OF THE JURORS FAILED TO DISCLOSE DURING VOIR DIRE THAT SHE HAD BEEN SEXUALLY APPROACHED AS A CHILD BY A STEPUNCLE?

After the trial was concluded, defense counsel was approached by one of the jurors, Mrs. G. She told him that when she was young she had been bothered by someone. She told her parents and was not believed. Based on this conversation, the fact that Mrs. G. left the jury box one day in a tearful condition, and waved to the child witness on one occasion, defense counsel made a motion for new trial asserting that Mrs. G. was guilty of misconduct by not revealing this during voir dire.

Mrs. G. was called to testify at the motion for new trial. She stated that when she was young she was playing in her trailer when her stepuncle walked into the room, started to unbuckle his belt and stated, "I will show you mine if you show me yours." At that time Mrs. G.'s grandmother walked in and the encounter ended. The grandmother took Mrs. G. to her parents and told them what happened; her parents did not believe her.

Two days prior to the trial in the instant case Mrs. G. was questioned as a prospective juror in a homosexual murder case. The jurors were asked if they had ever been a victim of a crime. Mrs. G. raised her hand and related the above event. She was questioned by the attorney whether the case had gone to court, and she stated it had not. Mrs. G. stated that she recalled the same question being asked in the instant case but she did not respond because "it was very embarrassing the first time. I felt humiliated to say so and since it was discarded the first time, there was no reason for any further humiliation, so I said, no, and also I believed I was not a victim."

Mrs. G. was then questioned as to her impartiality in the instant case and expressed her strong belief that she was very fair and impartial. She stated that her past experience did not enter into her deliberations in any way and she based her verdict solely on the evidence. Mrs. G. stated that the incident passed through her mind during jury selection in the instant case.

The court denied the motion for new trial and specifically found: ". . . There was no jury misconduct as to Juror Number One, Leeann G[];

"Two, Mrs. Leeann G[] was absolutely not biased one way or the other against or toward the defendant in this case or for or against the People;

"That according to Mrs. G[]'s testimony, which the Judge believes—the Court believes it absolutely—this defendant received a fair and impartial trial not only by Mrs. G[] but by all of the jurors.

"Further, I find that the evidence that I listened to during this trial, the demeanor of the defendant on the witness stand and the way he impressed me and I felt the jurors in the jury box, was that the evidence was overwhelming as to the defendant's guilt and after six days of trial the jury deliberated two hours or less and came in with a verdict of guilty on all counts and there were a lot of counts, namely, 17, and I thought the verdict of the jury was absolutely proper in all respects and that Mr. Kelly got a very, very fair trial and, therefore, I make those findings based on what I have seen here and observed not only at the trial of this matter but at the hearing for motion for new trial . . . ."

Defendant contends that the court erred by failing to grant a new trial based on the intentional misconduct of Juror Mrs. G. He asserts that Mrs. G.'s concealment deprived him of the right to uncover bias and therefore impaired his intelligent exercise of peremptory challenges. Defendant relies upon *People* v. *Diaz* (1984) 152 Cal.App.3d 926 [200 Cal.Rptr. 77] to support his position.

Respondent asserts that the court did not abuse its discretion when it denied the motion for new trial. The trial court's finding that misconduct did not occur is a finding of fact which cannot be disturbed on appeal. Even if misconduct occurred, no prejudice resulted which would require reversal.

Initially it should be noted that although Mrs. G. stated during the motion for mistrial that she was asked if she was a victim of child molestation during voir dire, this was not the case. Although it is clear that the court and counsel were concerned with people involved in some way in child molestation cases, neither the court nor counsel asked if any of the jurors had been victims of a child molestation.[1] Furthermore, the court's and

---

[1]Numerous questions were asked of the jurors during voir dire. The court questioned the first 12 jurors in the jury box. The pertinent questions asked were as follows: "Now, is there anyone in the jury where you or any of your close friends or relatives, and I mean close friends, not kissing cousins, but any close friends or relatives ever suffered, when I say suffered that's a polite word, have you ever been tagged with a charge such as the seventeen I have read to you here?

"Have you ever been charged with any child abuse crimes such as I have read here?

"Any of you in the jury box or any close friends or relatives?

"Now, have any of you in the jury box, or any close friends or relatives, ever been the victim of a serious crime? I am not talking about traffic tickets, I am talking about a serious

counsel's inquiries focused on serious crimes and specifically on the types of crime involved in the instant case. Although Mrs. G.'s past experience

---

crime, other than a child molest, any of you?

"Been a victim, that is, you have been robbed, you have been beaten, you have been stolen from, any of you had those serious crimes? . . .

"Now, is there anybody in the jury box that's been a witness to a serious crime, or charged with a serious crime, other than a child molest?

"I am talking about a serious crime. Anybody in that jury box been charged with a serious crime? . . .

"Now, the next question I am going to ask you is going to call upon your own good conscious [sic] and veracity is the only way to put it. Because of your background, any of you, because of your background, and your lifestyle, and I don't know what it is, or what they are, but would any of you be prevented because of that, and if you would rather answer that question in privacy simply raise your hands, would any of you really, down deep, be unable to give the People of the State of California a fair trial and this defendant a fair trial? That's something I want you to think about." Defense counsel questioned the prospective jurors as follows: "I would also be rather foolish if I didn't recognize that there might be some strong feelings about the nature of these seventeen charges that have been made. It might be the defendant, because of the age of the children, possible advantage that might have been taken from them as you hear the testimony, is there anyone on the jury that has such strong feelings that they would find it difficult to be fair and impartial in this trial due to the nature of these charges? . . .

"Now, you are not required as a juror, should you be selected, to put aside your common sense or your own experience in evaluating the evidence that's going to come before you. The Court has already reminded you of that. However, you have got to remember it is your duty as jurors, once you are sworn, to decide and determine the facts based solely on the evidence that you hear.

"If you are all selected as jurors, would you all do that?" The district attorney asked the following question of one of the potential jurors: "Have you had an experience where a friend or someone close to you was charged with a crime such as this and you have bad feelings about that?" Mrs. G. was called to the jury box and questioned as follows:

"THE COURT: Mrs. G[], from Thursday and this morning, is there anything you have heard that calls to mind that would prevent you from being a fair and impartial juror?

"JUROR []: I don't think so.

"THE COURT: Mr. Toton.

"MR. TOTON: Thank you, your Honor. I just call to mind the fact that People do have the burden to prove guilt in this case beyond a reasonable doubt and to a moral certainty. And that means that they put their case on first. Okay. And at that time, you might not look so well for Mr. Kelly, would you be willing to make up your mind at that time when the prosecution finishes its case?

"JUROR []: No.

"MR. TOTON: You realize you can't come to a conclusion until all of the evidence is in, is that right?

"JUROR []: I sure do.

"MR. TOTON: Would you agree that that's the way it should be?

"JUROR []: Yes, I do.

"MR. TOTON: Would you agree that would be the way you would do it if selected as a juror?

"JUROR []: Yes.

"MR. TOTON: Based on that, you understand that when we talk about proving guilt beyond a reasonable doubt and to a moral certainty, do you feel that you have to be convinced that Mr. Kelly is innocent?

"JUROR []: No, because he's supposed to be innocent right now.

"THE COURT: That's right, that's a good answer.

"MR. TOTON: I think you passed Civics 101 on that.

is certainly regrettable, it does not come close to rising to the seriousness of the crimes in the instant case. If anything, Mrs. G. was the victim of a misdemeanor of annoying or molesting a child under the age of 18. (Pen. Code, § 647a.) It is within this context that the cases of *People* v. *Diaz, supra,* 152 Cal.App.3d 926 and *People* v. *Jackson* (1985) 168 Cal.App.3d 700 [214 Cal.Rptr. 346] will be analyzed.

In *Diaz,* defendant was convicted of assault with a deadly weapon. *(Id.,* at p. 929.) "During the second day of jury selection . . ., the court told

"THE COURT: No, she listened.

"MR. TOTON: That's good. Let me ask you this then, if you were convinced that Mr. Kelly after hearing all of the evidence was not innocent but there was a reasonable doubt, what would your verdict be? If you were convinced that Mr. Kelly was not innocent, but you had a reasonable doubt as to his guilt, what would your verdict be?

"JUROR []: You mean if I had a hunch that he was guilty, but I wasn't sure as to how far he was guilty?

"MR. TOTON: Yes.

"THE COURT: That is right. In other words, the People didn't meet their burden of proof as to his guilt, how would you find for him? If the People didn't prove their case, what would you do?

"JUROR []: He would have to be innocent.

"THE COURT: Yeah, even though you thought he might be guilty.

"JUROR []: Yeah.

"MR. TOTON: One other point I'm trying to get across in my question is the fact that innocent and not guilty are not necessarily the same thing in a trial. In other words, the presumption of innocence means that Mr. Kelly does not have to put on any evidence to put on his 'innocence', it's the People's burden to prove each element of each count here beyond a reasonable doubt.

"Now, do you feel that before you can vote for acquittal you must be convinced that Mr. Kelly is innocent?

"JUROR []: No.

"THE COURT: Pass?

"MR. TOTON: Pass for cause.

"THE COURT: Miss Ryan.

"Ms. RYAN: Thank you, your Honor. Mrs. [], do you have children.

"JUROR []: No, I sure don't.

"Ms. RYAN: Have you had experience with being around kids?

"JUROR []: Yes, I have.

"Ms. RYAN: You understand that this trial is going to be based primarily on the testimony of two children. If you believe those children, would you have any problem voting for guilty?

"JUROR []: Not at all.

"Ms. RYAN: Let me ask you this, we have had some discussion about reasonable doubt, and I preface this by saying the defendant has absolutely no obligation to put on any evidence whatsoever. Let's assume that you are chosen as a juror, you get yourself back in the jury room and you find that there have been defense witnesses and those defense witnesses are saying something entirely different than what the prosecution witnesses are saying, you understand that isn't reasonable doubt, that's a conflict in the evidence? It's your job to go further, who's telling the truth, what the facts are and then decide whether we have proved this defendant guilty beyond a reasonable doubt?

"JUROR []: Yes.

"Ms. RYAN: Do you think you can do that?

"JUROR []: Yes.

"Ms. RYAN: Pass for cause."

the prospective jurors the nature of Diaz's charges, explaining he allegedly assaulted Lopez with a knife and by means of force likely to produce great bodily injury and inflicted great bodily injury upon his victim. The trial court posed a series of questions to the panel, including: 'Have any of you or has any one close to you ever suffered a similar charge to that in this case? [¶] Have any of you or has anyone close to you ever been a complaining witness *or a victim in a case of this kind?*' (Italics added.) Prospective juror Wolski sat silent. Later she was present during the voir dire of prospective juror Conti, who was asked by the district attorney if he or any of his friends had ever been involved in a knife fight. After Conti was challenged, Wolski was voir dired. The trial court asked if there was anything in her background or mind which if known to the attorneys might cause them to choose some other juror in her place. She responded 'No.' During questioning by defense counsel, she stated she had heard the questions asked of other jurors, and denied, if specifically asked, her answers would be different than theirs.

"During the last day of a four-day trial and after the People rested, Wolski told court personnel she had been attacked at knife point during a rape attempt, leaving a scar on her chin and had stabbed her assailant. At an in-chambers hearing, *the bailiff stated Wolski told him she was the victim of an attempted rape during which the assailant held a knife on her, gashing her chin; she escaped, hunted him down and stabbed him, stating she stabbed him in the wrong place since she didn't kill him.* A court clerk corroborated the bailiff's testimony. Defense counsel then asked them their impression regarding her as an impartial juror. The bailiff responded: 'My opinion, she is prejudiced as to violent crimes, especially that of women. She is obsessed with rape, with victims, and the men who perpetrate this act. I cannot honestly say that she would be an impartial juror as to violent crime. Now, whether it would tie into this, whether she would still have any knowledge of this crime as to supposedly rape, such that she has worked with or attempted rape, I don't know. But she does have a very acute obsession with rape.' The clerk concurred. Wolski explained she was the victim of an attempted rape 13 years earlier when she was assaulted by a man who gashed her with a knife. When he let go, she pushed against him causing his knife to enter him. Although she stated she did not remember being specifically asked whether she had been a victim of any similar type of incident involving a knife, she later stated, when the judge asked her regarding similar incidents, it never occurred to her the assault on her was an assault with a deadly weapon. She stated the incident would not bias her perception of the case. The trial court then asked defense counsel whether he was willing to proceed with 11 jurors. Upon defense counsel's refusal to so stipulate, the trial court denied his motion to dismiss Wolski." (*Id.*, at pp. 930-931, fn. omitted.)

The defendant appealed contending he was denied his right to a fair and impartial trial by Juror Wolski's intentional or unintentional nondisclosure. (*Id.*, at pp. 931-932.) The appellate court agreed. In their discussion interweaving juror misconduct cases with jury voir dire cases, the "*Diaz* court concluded that this was juror misconduct 'regardless whether nondisclosure was unintentional and based upon a good-faith misunderstanding of the meaning of the question . . . .' [Citation.] The court further went on to hold that the juror's denial of bias was 'self-serving' and could not be taken seriously as 'the prior experience may cause unconscious bias. Only individuals of strong character would not be affected. . . . Subconsciously, the juror may tend to favor the prosecution . . . .' [Citation.]" (*People* v. *Jackson, supra,* 168 Cal.App.3d 700, 704.) The *Diaz* court, without so holding, went on to suggest in a footnote that the nondisclosure of concealed information directly relating to potential juror bias should be considered prejudicial per se. (*People* v. *Diaz, supra,* 152 Cal.App.3d at p. 937, fn. 6.)

We find that the majority opinion in *Diaz* is too far reaching and broad and could result in frequent unjustified reversals. We are in accord with the dissent which states: "Appellant's due process rights were not violated by an unintentional failure of a juror to disclose a prior involvement as a victim of a criminal act which might lead to a peremptory challenge. Perfect voir dire is rarely attained. Since *People* v. *Williams* (1981) 29 Cal.3d 392 . . ., counsel may examine very broadly in voir dire. Given the opportunity to have a verdict reversed based on nondisclosure, counsel may now choose to examine very narrowly or not at all during voir dire.

"The facts here do not require a reversal. The person in the best position to evaluate the request to remove the juror was the trial judge. Deference should be given to his decision and the conviction should be affirmed." (*Id.*, at pp. 943-944.)

Furthermore, the court in *Diaz* adopted the following approach on how to handle these types of matters. "'The failure of a juror to respond to a relevant, direct, and unambiguous question leaves the examining attorney uninformed and unable to ask any follow-up questions to elicit the necessary facts to intelligently reach a decision to exercise a peremptory challenge or to challenge a juror for cause. Therefore, we hold that where, as here, a prospective juror in a criminal case fails to respond to a relevant, direct and unambiguous question presented by defense counsel in voir dire, although having knowledge of the information sought to be elicited, the trial court should, upon motion for a new trial, determine whether the question propounded to the juror was (1) relevant to the voir dire examination; (2)

whether it was unambiguous; and (3) whether the juror had substantial knowledge of the information sought to be elicited. If the trial court's determination of these inquires is in the affirmative, the court should then determine if prejudice to the defendant in selecting the jury reasonably could be inferred from the juror's failure to respond. If prejudice reasonably could be inferred, then a new trial should be ordered.'" (*Id.*, at p. 935.) The instant case reveals that the questions propounded to Mrs. G. were anything but direct and unambiguous. Thus, the instant case is distinguishable from *Diaz.*

Here Mrs. G. was not asked the type of questions necessary to elicit the information which was later revealed. Her nondisclosure was thus unintentional.

The court in *People* v. *Jackson, supra,* 168 Cal.App.3d 700 disagreed with *Diaz.* In *Jackson* the defendant was convicted of possession of marijuana for the purpose of sale. (*Id.*, at p. 702.) During voir dire defense counsel stated: "'Another catch-all question: Is there anybody in the jury who up to this point has had anything in their background come to mind who's wondering if I asked you a question where you would have to tell me about it? This is what's known as the skeleton in the closet question.

"'You know, for example, is there someone whose son is a policeman and they wonder if they would have to tell us about that, and so forth.

"'Anything in your background where you thought if I asked you a question and haven't mentioned—you haven't mentioned already of course.'

"Juror George Burns did not respond to this question." (*Id.*, at p. 702.) During deliberations Juror Burns sent out a note advising the court that he had just remembered that his nephew died from drug-related reasons. The court declined to excuse Juror Burns and substitute an alternate. The appellant, relying on *Diaz,* asserted that this was error. (*Id.*, at p. 704.) The court refused to accept the *Diaz* rationale and adopted the analysis of *People* v. *Resendez* (1968) 260 Cal.App.2d 1 [66 Cal.Rptr. 818]. The *Jackson* court stated: "It is clear that where a juror intentionally lies on voir dire, such an act constitutes misconduct. (*People* v. *Castaldia* (1959) 51 Cal.2d 569 . . . . But to find misconduct where 'concealment' is unintentional and the result of misunderstanding or forgetfulness is clearly excessive. It is with good reason that the law places severe limitations on the ability to impeach

a jury's verdict. To hold otherwise would be to declare 'open season' on jury verdicts not to a party's liking. A green light would be given for every unsuccessful litigant to root out after-the-fact evidence of any 'subconscious bias.'" (*Id.*, at pp. 704-705.)

The court quoted from *McDonough Power Equipment, Inc.* v. *Greenwood* (1984) 464 U.S. 548 [78 L.Ed.2d 663, 104 S.Ct. 845], "'To invalidate the result of a three-week trial because of a juror's mistaken, though honest response to a question, is to insist on something closer to perfection than our judicial system can be expected to give. A trial represents an important investment of private and social resources, and it ill serves the important end of finality to wipe the slate clean simply to recreate the peremptory challenge process because counsel lacked an item of information which objectively he should have obtained from a juror on *voir dire* examination.' [Citation.] 'This court has long held that "'[a litigant] is entitled to a fair trial but not a perfect one,' for there are no perfect trials."' (*McDonough, supra*, 464 U.S. 548, 553 [78 L.Ed.2d 663, 669, 104 S.Ct. 845, 848.)" (*Id.*, at p. 706.)

The *Jackson* court concluded: "To adopt the alternative holding articulated by *Diaz* is clearly inconsistent. Our own Supreme Court has stated that the applicable standard for excusing a juror in midtrial—even where the juror forthrightly admits that he is biased—is whether there is good cause for the trial court to conclude that he is unable to perform his duty. [Citation.] To conclude that a juror is guilty of misconduct—thereby rendering the verdict presumptively prejudicial [citations]—because the juror has unintentionally failed to disclose a fact that *might* make him biased, and then to further discount the juror's denials of bias as 'self-serving' is certainly anomalous. A much harsher standard would be imposed for a forgetful juror than one who is openly prejudiced against a party. Such a result is out of all proportion to the nature of the error, and is clearly inconsistent with the ends to be achieved.

"Accordingly, we conclude that the proper test to be applied to unintentional 'concealment' is whether the juror is sufficiently biased to constitute good cause for the court to find under Penal Code sections 1089 and 1123 that he is unable to perform his duty. In the instant case, we conclude that the trial court did not abuse its discretion in determining that the juror was not biased. The juror himself stated that his decision would not be affected, and the court drew the reasonable inference that the juror was only coming forward because he was conscientious in his duty. 'No individual comes to jury duty with his mind a blank slate, and it is in the balanced wisdom of group experience applied to collective deliberation that the strength of the

jury system theoretically lies.' (*People* v. *Resendez, supra,* 260 Cal.App.2d at p. 11.) We therefore find no error in the court's decision not to exclude the juror." (*Id.,* at p. 706.)

In *People* v. *Resendez, supra,* 260 Cal.App.2d 1, the defendant kissed and caressed the nine-year-old victim, fondling her private parts, inserted his finger into her private parts and exposed his penis to her. On voir dire Juror Robinson was asked if an event of a similar nature had happened to her and she answered negatively. It was discovered later that during deliberations Mrs. Robinson related the following to the jury. When Mrs. Robinson was 15 her "stepfather during a moment of sexual excitement pressed her to him, fully clothed, and asked whether it felt good, but he did not feel beneath her garments." (*Id.,* at p. 11.) The trial court denied a motion for new trial and defendant appealed. The appellate court held: "'. . . Jurors in a criminal action subscribe to an oath to render a true verdict according to the evidence. . . . Under the oath which they take they cannot without a violation thereof receive impressions from any other source. However, the crucial question is whether it can be proved as a fact or may be presumed as a conclusion of law that the verdict of the jury may have been influenced by information or impressions received from sources outside of the evidence in the case.' [Citation.] The mention of the inquiry, 'Does it feel good' stimulated Mrs. Robinson's recollection and in the heat of jury deliberation she commented accordingly, not to influence the verdict improperly, but merely to shed additional light on the issue of credibility. No individual comes to jury duty with his mind a blank slate, and it is in the balanced wisdom of group experience applied to collective deliberation that the strength of the jury system theoretically lies. In fact, free expression during jury deliberation is to be encouraged and, 'To allow verdicts to be defeated because of improper remarks of a juror in the course of their deliberations upon the issues under consideration would be calculated to discourage free discussion which is deemed essential to the development of a full knowledge and a ripe judgment of the jury.' [Citation.] Mrs. Robinson's remarks do not disclose a biased or prejudiced mind against appellant, were disapproved by the rest of the jury, showed no immediate influence on the balloting, and apparently had no substantial influence upon the ultimate verdict; hence we find no miscarriage of justice." (*Ibid.*)

■ In the instant case defendant was not denied the right to a fair and impartial jury. This was shown by the following factors: (1) Mrs. G.'s nondisclosure was not intentional; (2) the past experience of Mrs. G. was dissimilar from the crimes in the instant case lessening the chance for bias; (3) Mrs. G. demonstrated her conscientiousness by coming forward with this information; (4) Mrs. G. did not reveal this during deliberations so the other jurors were not influenced; and (5) the court conducted an adequate

inquiry to determine if Mrs. G. was biased. She clearly denied any bias or impropriety.

## II., III.*

. . . . . . . . . . . . . . . . . . . . . . . .

The judgment is affirmed.

Hamlin, Acting P. J., and Papadakis (V. N.), J.,† concurred.

Appellant's petition for review by the Supreme Court was denied December 3, 1986.

---

*See footnote on page 118, *ante*.
†Assigned by the Chairperson of the Judicial Council.